Mack SCOTT et al.,
Plaintiffs-Appellants,

v.

The CITY OF ANNISTON, ALABAMA,
et al., Defendants-Appellees.

No. 77–1979.

United States Court of Appeals,
Fifth Circuit.

June 25, 1979.

Rehearing Denied July 13, 1979.

George C. Longshore, Birmingham, Ala., for plaintiffs-appellants.

John R. Phillips, Anniston, Ala., for Anniston Civil Serv. Bd., Miller & Sawyer.

Richard B. Emerson, Anniston, Ala., for City of Anniston et al.

Before MORGAN, FAY and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

In this Title VII class action,[1] brought on behalf of black employees of the Public Works Department of the City of Anniston, Alabama, many of the issues turn on whether it suffices, in order to prevail, that plaintiffs prove discrimination alone or whether they must in addition prove that it was purposeful. We hold, on both principle and authority, that proof of intentional discrimination is not essential to recovery in a Title VII action even when the employer is a governmental agency, and that the requirement of equal employment opportunity prohibits all invidious employment practices, even those not intended to achieve a prohibited end.

Turning to the other issues in the case, we find that a prima facie case of discrimination was proved, and that the defendants failed to refute it; therefore, we remand the class action for further proceedings.[2]

---

1. 42 U.S.C. § 2000e et seq.

2. The class certified by the district court comprises "all past, present, and future employees in the public works department of the City of Anniston who were at work on or after December 2, 1972."

However, because substantial evidence supports the trial court's factual determination that Mack Scott's discharge was not motivated by racial discrimination, we affirm the holding of the district court denying him relief. We reach these conclusions for reasons explained below.

## I.

■ Discriminatory intent must be shown in fourteenth-amendment actions against government agencies. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 1977, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450, 464; *Washington v. Davis,* 1976, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597. *See also Austin Independent School District v. United States,* 1976, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (per curiam). As a result, the trial court in the present case reasoned that intent is also a prerequisite to success in Title VII actions against such agencies; it considered that, notwithstanding the power granted Congress by the fourteenth amendment, the legislature could not by statute create a right of action subject to less stringent requirements than those imposed by that amendment alone. We cannot accept that assumption.

*Washington, supra,* held that to prevail under Section 1981[3] a plaintiff must prove discriminatory purpose. Section 1981 grants all persons the same right to contract as is enjoyed by white citizens. It therefore implements directly the equal protection guarantees of the fourteenth amendment. The Court did not distinguish the elements required to recover from governmental agencies from those that must be shown against private persons. The Court did expressly distinguish, however, between the standards applicable under the Fair Employment Practices Act and those controlling under the fourteenth amendment. 426 U.S. at 239–40, 246–47, 96 S.Ct. at 2047, 2051, 48 L.Ed.2d at 611, 612. This distinction has been reaffirmed in a recent case in which the Court expressly noted that discriminatory intent need not be shown in a Title VII action. *International Brotherhood of Teamsters v. United States,* 1977, 431 U.S. 324, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396, [involving a private employer].

Two circuits have expressly ruled that a Title VII plaintiff need not prove intentional discrimination in an action against a governmental unit. *United States v. City of Chicago,* 7 Cir. 1978, 573 F.2d 416, 420–24; *Firefighters Institute for Racial Equality v. City of St. Louis,* 8 Cir. 1977, 549 F.2d 506, 510, *cert. denied sub nom. United States v. Banta,* 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76. *See also Davis v. County of Los Angeles,* 9 Cir. 1977, 566 F.2d 1334, 1341 n.14 *vacated as moot,* 1979, —— U.S. ——, 99 S.Ct. 1379, 59 L.Ed.2d 642. This circuit has made the same observation in dicta. *See Grigsby v. North Mississippi Medical Center,* 5 Cir. 1978, 586 F.2d 457, 461. Neither the Supreme Court nor any circuit court has held that Title VII imposes different requirements depending upon whether the suit is against a governmental employer or a private litigant. We see no reason to initiate such a distinction.

■ The fourteenth amendment empowers Congress to enact appropriate legislation establishing more exacting requirements than those minimum safeguards provided in the amendment. *Katzenbach v. Morgan,* 1966, 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828. The plaintiff in *Katzenbach* argued "that an exercise of congressional power under § 5 of the Fourteenth Amendment that prohibits the enforcement of a state law can only be sustained if the judicial branch determines that the state law is prohibited by the provisions of the Amendment that Congress sought to enforce." *Id.* at 648, 86 S.Ct. at 1722, 16 L.Ed.2d at 834. In rejecting this argument, the Court noted that "[i]t would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional,

---

**3.** 42 U.S.C. § 1981.

or of merely informing the judgment of the judiciary by particularizing the 'majestic generalities' of § 1 of the Amendment." 384 U.S. at 648–49, 86 S.Ct. at 1722, 16 L.Ed.2d at 834. The judicial task is limited to determining whether legislation enacted pursuant to the authority conferred by the fourteenth amendment is, as required by § 5, appropriate to enforce the equal protection clause. 384 U.S. at 649–50, 86 S.Ct. at 1723; 16 L.Ed.2d at 834–835.

■ In addition to enacting a constitutional standard, the fourteenth and fifteen amendments granted significant power to Congress. *See, e. g., Fitzpatrick v. Bitzer,* 1976, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614; *Oregon v. Mitchell,* 1970, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (opinion of Black, J., announcing judgments of the Court); *South Carolina v. Katzenbach,* 1966, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769; *Ex parte Virginia,* 1880, 100 U.S. 339, 25 L.Ed. 676. As the Court noted in *Fitzpatrick, supra,* "these Amendments 'were intended to be, what they really are, limitations of the power of the States and enlargements of the power of Congress.'" 427 U.S. at 454, 96 S.Ct. at 2670, 49 L.Ed.2d at 620, *quoting Ex parte Virginia, supra,* 100 U.S. at 345, 25 L.Ed. at 679. Thus, even if Title VII were enacted pursuant to fourteenth-amendment power alone, a question we need not here decide, Congress is authorized to enact more stringent standards than those provided by the fourteenth and fifteenth amendments in order to carry out the purpose of those amendments.

■ Title VII is unquestionably appropriate legislation to enforce the equal protection clause. In *Griggs v. Duke Power Co.,* 1971, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158, the Court noted that Title VII was intended to carry out the objectives of the fourteenth amendment, and that the "disproportionate impact" standard was an appropriate means of fulfilling those objectives. It added:

> Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.

401 U.S. at 430, 91 S.Ct. at 853, 28 L.Ed.2d at 163.

The decision in *National League of Cities v. Usery,* 1976, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245, which was cited by the district court, does not require a different result. The plaintiffs there challenged 1974 amendments to the Fair Labor Standards Act of 1938 extending its minimum wage and maximum hour provisions to almost all employees of states and their political subdivisions. The Court held that, to the extent the amendments operated directly to displace the states' ability to structure employer-employee relationships in areas of traditional governmental functions, they were not within the authority granted Congress by the commerce clause. The Court stressed that Congress was seeking to wield its power "in a fashion that would impair the States' 'ability to function effectively in a federal system'." *Id.* at 852, 96 S.Ct. at 2474, 49 L.Ed.2d at 257, *quoting Fry v. United States,* 1975, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1796, 44 L.Ed.2d 363, 369. It concluded that this legislation would have effects that would "not comport with the federal system of government embodied in the Constitution." *Id.*

Title VII relies at least in part on fourteenth-amendment prerogatives. *Fitzpatrick v. Bitzer, supra,* 427 U.S. at 453 n.9, 96 S.Ct. at 2670, 49 L.Ed.2d at 620. Its impact on state and local governments does not impair their ability to function effectively in a federal system. Thus, in *Firefighters Institute for Racial Equality v. City of St. Louis, supra,* the Eighth Circuit noted in dicta that *Usery* was "undoubtedly inapposite" to Title VII, *see* 549 F.2d at 510 n.5, an observation with which we agree. Title VII intrudes less than minimum wage legislation on the role of state and local governments, places a less stringent financial burden on them, and reflects a more important national purpose—that of ending discrimination.

For these reasons, we hold that, whether the employer be private or public, the same prerequisites to Title VII liability apply, and discriminatory purpose need not be shown. Following this standard, we review the facts.

## II.

This action was brought by three black employees of the Public Works Department of the City of Anniston, individually and on behalf of a class of persons similarly situated, against the city, the mayor, members of the city council, the civil service board and its members. The complaint alleged racial discrimination in their employment in violation of Title VII because of testing requirements imposed by the city's civil service board in connection with the determination of promotions within the department. In addition, Mack Scott, one of the named plaintiffs, alleged that he was discriminatorily discharged. The parties stipulated that the action was appropriate for class treatment.

At the trial, the plaintiffs offered the results of some of the tests and the testimony of several class members. Only four of the 17 blacks who had taken the test for the position of Equipment Operator I had passed while all 22 whites taking the same test had passed. Blacks had failed other tests in significantly greater numbers than white employees, and there were wage differentials between black and white employees.

The defendants presented evidence that nine of ten individuals promoted to the position of Equipment Operator I in 1971, prior to the first administration of the written test for this position, were black; these ten were required to take only an oral examination. The defendants also showed that, of those 13 blacks who failed to pass the Equipment Operator I test, at least four were later given a performance test, which they passed, and were then promoted. There was evidence of other efforts by the city to see that blacks were promoted: eligibility lists were terminated as soon as all eligible blacks were taken; all blacks making the eligibility lists were always employed; and meetings were held with black civic leaders at which these leaders were urged to encourage black persons to apply for employment. Moreover the written tests have apparently not been given since 1975 or 1976.

Nonetheless the fact remains that there were 26 positions in the department, but there were black employees in only the three classifications employing the least skilled and the greatest number of persons. The city suggests that this is because many of the employees in the other 23 classifications were hired years ago and have seniority. However, the persons in at least five of these classifications, Director of Public Works, Equipment Maintenance Supervisor, Engineer Aide I, Clerk II, and Auto Mechanic, were appointed on or after September 17, 1970. For example, all six persons classified as Auto Mechanics were appointed on or after May 12, 1971. Although two of the four white Equipment Operator III's were appointed before 1970, the other two were appointed after 1972.

■ Taken as a whole, the evidence supports the trial court's finding that the defendants' tests and practices were discriminatory in their impact. The city did make some efforts to alleviate that result, but the efforts were not effective.

## III.

■ Once the racially adverse impact of an examination is demonstrated by statistical .or other evidence, the burden of proof shifts to the employer to prove that the exam is job-related. *Albemarle Paper Co. v. Moody,* 1975, 422 U.S. 405, 426, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280, 301. *See Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. at 854, 28 L.Ed.2d at 164. Employment *practices* having a racially adverse effect are subject to the same scrutiny: if a prima facie case of discriminatory practice is shown, it becomes the employer's burden to demonstrate the job performance validity of its practices. *Washington v. Davis, supra.* The employer's burden is not satisfied by establishing merely a rational basis for a test; the test must be validated. *Washington v. Davis, supra,* 426 U.S. at 247, 96 S.Ct. at 2051, 48 L.Ed.2d at 611. Validation, in general, requires a demonstration that "the qualifying tests are appropriate for the selection of qualified applicants for the job in question." *Id.* Validation by any one of a number of methods of making

such a showing, *see id.* at 247 n.13, 96 S.Ct. at 2051, 48 L.Ed.2d at 611, suffices to refute statistical evidence that a test has had a disproportionate racial impact. *Id. See also Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 425–31, 95 S.Ct. at 2375–78, 45 L.Ed.2d at 300–304. The same sort of validation will rebut the inferences drawn from statistical evidence of racial discrimination based on work practices.

In finding that the defendants had refuted the plaintiff's case by presenting credible, contradictory evidence, the district court supported its conclusion in part by stating that the firm from which the city purchased its tests had testified that the tests were validated. The city admits that this is incorrect: the parties had merely stipulated that the firm had *told* the city that all of the tests sold to it were validated. No evidence was presented at trial concerning how the tests had been validated, and the stipulation merely established the city's subjective good faith, not the fact of test validity.

■ The defendants had the burden to show validation of the tests they used. *Dothard v. Rawlinson,* 1977, 433 U.S. 321, 328, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786, 796; *Washington v. Davis, supra.* In this respect, they failed. Moreover, the evidence casts doubt on the validity of the tests. Some blacks who had satisfactorily performed jobs were demoted after they failed written tests. Other blacks who had failed written tests performed satisfactorily when they were promoted after passing a performance test.

■ The defendants' evidence that they had affirmatively sought to recruit blacks to be employees and to enhance their job opportunities within the city was insufficient to refute the prima facie case established by the plaintiffs' statistical evidence. There was no showing that the disparate racial impact of the written tests was effectively counterbalanced by the city's attempts to recruit blacks, by its relatively few on the job tests and by its ultimate abandonment of tests. We do not imply that Title VII exacts determined affirmative action; we do hold that it is not a

sufficient defense to racial discrimination to demonstrate that ineffective efforts were made to undo such discrimination. The vice condemned by the statute is racial discrimination in practice, and that is none the less a fault though it be wrought with innocent or benign intent.

## IV.

We turn now to the discharge of Mack Scott. The city's garbage collection had been handled through a "task force" work system which allowed each individual crew to cease working for the day, regardless of the number of hours its members had worked, when they had completed collection in their assigned territory. Under this system Scott was able to hold down two jobs.

In early 1974 the employees in the public works department were informed at a department meeting that there would be a change to a system of eight-hour shifts. Scott missed this meeting and did not learn of the change until the Friday before the Monday when the new system was to be implemented. He then learned that he had been assigned a shift from 4:00 P.M. to midnight, even though his moonlighting job was from 10:00 P.M. until 6:00 A.M.

On Monday, Scott did not work his assigned shift; it was worked by James Turner. Scott asserts that he had obtained permission from his supervisor, Joe Byars, to have a substitute work in his place, and that he had arranged for Turner to work for him in return for his taking a different shift for Turner. The defendants assert that he did not obtain permission for the substitution, that he had not made arrangements with Turner, and that he refused to work that day when approached by Arthur Hardy. They also argue that he was subsequently offered his job back, but refused to take it; however, Scott disputes this point. In any case, Scott was fired when he arrived at work the morning after he failed to work his shift.

The trial court found that Scott's failure to attend his regularly scheduled shift was a dereliction of duty on his part, and did not result from an attempt to swap shifts with another employee in the public works de-

partment. The court concluded, apparently on this basis, that Scott was fired for misconduct, and not because of his race.

There was substantial evidence that Mr. Scott did not have permission to make such a switch in job assignments, and that he refused to come to work when assigned. The trier of fact made a credibility determination that clearly was both its prerogative and its duty. The court's denial of Scott's claim is fully supported by the record.

### V.

The dismissal of the class action is REVERSED and the case is REMANDED to the district court for further proceedings consistent with this opinion. The district court's decision denying Mack Scott's individual claim is AFFIRMED.

Reversed and Remanded in Part; Affirmed in Part.