Dianne BELCH, Juliette Dinkins, Denise Horton, Jean Cleveland, and Rita McWhorter Jackson, Plaintiffs,

v.

**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, Defendant.**

No. 3:94–CV–129 (DF).

United States District Court, M.D. Georgia, Athens Division.

Nov. 20, 1998.

John F. Beasley, Jr., Athens, GA, for Plaintiffs.

Melanie D. Wilson, Atlanta, GA, Julia B. Anderson, Atlanta, GA, for Defendant.

## ORDER

FITZPATRICK, Chief Judge.

■ This suit involves claims under both the Equal Pay Act, 29 U.S.C. § 206, and Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* Before this Court is a Motion by Defendant to Dismiss Plaintiff's Equal Pay Act claims based on Eleventh Amendment immunity.[1] The primary issue in this case is whether Congress successfully abrogated the States' Eleventh Amendment immunity when it enacted the Equal Pay Act. For the reasons given below, this Court concludes that it did, and Defendant's Motion to Dismiss is therefore **DENIED.**[2]

## I. Background

■ The Eleventh Amendment precludes any person from bringing suit against a State in federal court.[3] *See Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 (1990). This immunity, however, may be lost in one of two ways. A State may consent to suit in federal court. *See Petty v.*

*Tennessee–Missouri Bridge Comm'n,* 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959). In the absence of such consent, Congress can abrogate the States' Eleventh Amendment immunity. *See Feeney,* 495 U.S. at 304, 110 S.Ct. at 1872. The State of Georgia has not consented to suit in this case, so Plaintiff in the instant case can proceed only if Congress abrogated the States' Eleventh Amendment immunity for suits arising under the Equal Pay Act.

■ The ability of Congress to abrogate Eleventh Amendment immunity is well established, *see e.g. Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), but this power is not absolute. The Supreme Court has stated that there are limits both as to how Congress may abrogate the States' sovereign immunity as well as when Congress may abrogate such immunity. "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). Furthermore, Congress may only abrogate the States' sovereign immunity when exercising its powers under § 5 of the Fourteenth Amendment. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 59, 66, 116 S.Ct. 1114, 1125, 1128, 134 L.Ed.2d 252 (1996).

## II. *The Application of the Eleventh Amendment to the Equal Pay Act*

With the foregoing principles in mind, the Court has two major questions to address in

---

1. Defendant presented its Motion to Dismiss just two weeks before the case was set for trial. A defense predicated on Eleventh Amendment immunity, however, goes to the jurisdiction of the Court and may be raised for the first time on appeal. See *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974); *Zatler v. Wainwright,* 802 F.2d 397, 399 (11th Cir.1986). This Court must therefore consider Defendant's Motion to Dismiss before proceeding to a trial on the merits of this dispute.

2. This order supersedes the Court's order of October 29, 1998.

3. The Eleventh Amendment states:
 The judicial power of the United States shall not be construed to extend to any suit in law or

equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State.
U.S. Const. amend. XI. By its terms, the Eleventh Amendment does not immunize States from suits in federal court brought by citizens of that State. The Supreme Court, however, in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), interpreted this provision to also bar suits against a State in federal court by one of its own citizens—the situation facing the Court in the instant case. *See also Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54 n. 7, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996).

the instant case. First, whether Congress manifested its unmistakable intent to abrogate States' sovereign immunity for claims arising under the Equal Pay Act, and second, whether Congress acted "pursuant to a valid exercise of power." *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. at 1123 (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985)) (internal quotations omitted). These questions will be examined in turn.

### A. Congress's Intent to Abrogate the States' Immunity

The requirement that Congress use "unmistakably clear language" when abrogating the States' Eleventh Amendment immunity is not just an arbitrary rule of statutory construction that federal courts use to ascertain congressional intent. Instead, the requirement is necessary to ensure that Congress has thought carefully before altering "the fundamental constitutional balance between the Federal Government and the States." *Dellmuth v. Muth*, 491 U.S. 223, 227, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181 (1989) (quoting *Atascadero*, 473 U.S. at 238, 105 S.Ct. at 3145) (internal quotations omitted). As one commentator aptly put it, "[i]f Congress is the only source of protection of the states' interests, it does not seem unfair for the Court to force Congress to do its job." *Brown, State Sovereignty Under the Burger Court—How the Eleventh Amendment Survived the Death of the Tenth: Some Broader Implications of Atascadero State Hospital v. Scanlon*, 74 Geo.L.J. 363, 390 (1985).

■ The Supreme Court has been very specific in recent years about how Congress may abrogate the States' Eleventh Amend-

ment immunity. Not only does the Court require a clear indication of congressional intent, the Court also requires this intent to be manifested in the language of the statute. *See Dellmuth v. Muth*, 491 U.S. at 230, 109 S.Ct. at 2401. Consequently, legislative history indicating an intent to abrogate will generally be insufficient. *See Hilton v. South Carolina Pub. Rys. Comm'n*, 502 U.S. 197, 204, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) ("Congressional intent to abrogate ... must be expressed in the text of the statute; the Court will not look to legislative history in making its inquiry.").

Before addressing the question of whether Congress clearly intended to abrogate the States' Eleventh Amendment immunity under the Equal Pay Act, one must first understand the relevant statutory framework. The Equal Pay Act of 1963, Pub.L. No. 88–38, 7 Stat. 56 (codified at 29 U.S.C. § 206(d)), was first enacted by Congress as an amendment to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201–219. The Act prohibits wage discrepancies on the basis of sex.[4] Congress chose to implement this provision by using the administrative and enforcement apparatus of the FLSA. Accordingly, any wages wrongfully withheld from any employee under the Equal Pay Act are deemed "unpaid minimum wages or overtime compensation," *see* 29 U.S.C. § 206(d)(3), and may be recovered pursuant to 29 U.S.C. § 216(b).

As originally enacted, the FLSA applied only to private employers. *See Marshall v. Owensboro–Daviess County Hosp.*, 581 F.2d 116, 117 (6th Cir.1978). In 1974, however, Congress extended application of the FLSA to the States.[5] See Fair Labor Standards

---

**4.** The Equal Pay Act provides that:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is

made pursuant to (i) seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.
29 U.S.C. § 206(d)(1).

**5.** Congress attempted to extend the FLSA to the States in 1966. Yet, in 1973, the Supreme Court held that the 1966 amendments to the FLSA did

Amendments of 1974, Pub.L. No. 93–259, § 6, 88 Stat. 55, 58–62. The term "employers" is now defined to include public agencies, and public agencies are in turn defined to include "the government of a State or political subdivision thereof." 29 U.S.C. §§ 203(d), (x). An "employee" is also defined to include those individuals "employed by a State, or an interstate governmental agency." *Id.* § 203(e)(2)(C). The FLSA enforcement clause ties these provisions together by providing for "action to recover the liability prescribed ... against any employer (including a public agency) in any Federal or State court of competent jurisdiction...." 29 U.S.C. § 216(b).

Defendant, relying on a recent decision from the Eleventh Circuit in *Kimel v. State of Fla. Bd. of Regents*, 139 F.3d 1426 (11th Cir.1998), contends that the Equal Pay Act does not contain an unequivocal expression of congressional intent to abrogate States' Eleventh Amendment immunity. In *Kimel*, a fragmented panel of the Eleventh Circuit concluded that Congress did not abrogate the States' sovereign immunity when it enacted the Age Discrimination in Employment Act ("ADEA"). *See id.* at 1429. A majority of the panel, however, could not agree on a controlling rationale. *See id.* at 1428 n. 1. Only two of the three judges involved in that case even addressed the question of whether Congress intended to abrogate States' sovereign immunity under the ADEA, and they reached diametrically opposite conclusions.

Like the Equal Pay Act, the ADEA was expanded in 1974 to include States and their political subdivisions within the definition of an "employer." Pub.L. No. 930259, § 28, 88 Stat. 74 (codified at 29 U .S.C. § 630(b)(2)). But the ADEA, unlike the Equal Pay Act, contains a hybrid-enforcement scheme. Both statutes incorporate the enforcement apparatus of the FLSA. For instance, wages withheld in violation of the ADEA are also treated like "unpaid minimum wages or overtime compensation," and remedies may be sought pursuant to 29 U.S.C. § 216. *See* 29 U.S.C.

§ 626(b). The ADEA, however, also contains its own enforcement provision. *See* 29 U.S.C. § 626(c). This provision contains no reference to either "States" or "employers." *See Kimel*, 139 F.3d at 1431 (opinion of Edmondson, J.).

The presence of these two different enforcement clauses led the Eighth Circuit to conclude that Congress failed to clearly state its intent to abrogate the States' Eleventh Amendment immunity under the ADEA. *See Humenansky v. Regents of the University of Minnesota*, 152 F.3d 822, 825 (8th Cir.1998). The Eighth Circuit discussed the ambiguity created by the hybrid enforcement scheme:

> If we look only at § 626(c), the 1974 ADEA amendments are just like the 1966 FLSA amendments at issue in *Employers* —Congress now covered public employers but did not expressly allow them to be sued in federal court. On that basis, we would conclude no intent to abrogate ... On the other hand, if we look at the ADEA's enforcement scheme from the perspective of its cross-reference to the FLSA, Congress cured the abrogation deficiency found in *Employers* by amending § 216(b) at the same time § 630(b)(2) was amended to include States and other public employers.

*Id.* at 825. To conclude that Congress abrogated the States' Eleventh Amendment immunity under the ADEA, a court would have to infer that the amendments to the FLSA enforcement provision were also meant to apply to the ADEA's separate enforcement provision. "[T]he need to construe one section with another, by its very nature, hints that no *unmistakable* or *unequivocal* declaration is present." *Kimel*, 139 F.3d at 1431 (opinion of Edmondson, J.).

By contrast, the Equal Pay Act is on much more solid footing. The Equal Pay Act contains no hybrid enforcement scheme. The sole enforcement provision for the Act is 29 U.S.C. § 216(b), and that provision contains

---

not abrogate States' immunity from suit in federal court. *See Employees v. Department of Pub. Health & Welfare*, 411 U.S. 279, 284–86, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). Congress responded by amending the FLSA the following year.

See *supra.* As noted earlier, however, this legislative history is not relevant to the Court's decision in this case. *See Dellmuth*, 491 U.S. at 230, 109 S.Ct. at 2401.

no ambiguity. The statute expressly provides for both legal and equitable relief. *See* 29 U.S.C. § 216(b). The statute then says that an action to recover such relief can be maintained "against any employer *(including a public agency)* in any Federal or State court of competent jurisdiction." *Id.* (emphasis added). One would have to ignore the plain language of the statute to conclude that a State could not be sued for damages in federal court.

Despite the seemingly clear language of the FLSA enforcement provision, Judge Edmondson argues that it too lacks the requisite clarity necessary to abrogate the States' Eleventh Amendment immunity. First, he says that the language does not make it clear that a State can be sued in federal court. Since the statute expressly provides that a suit may be brought in a court of competent jurisdiction, and since a federal court does not generally have jurisdiction over suits brought by a citizen against a State, "[o]ther, private employers could be the intended defendants in such suits." *Kimel,* 139 F.3d at 1432 n. 11 (opinion of Edmondson, J.). Second, he argues that the statute does not exclude the possibility that only equitable relief may be available for suits brought against a State in federal court. *See id.*

Judge Edmondson places great weight on the absence of such phrases as "sovereign immunity" and "the Eleventh Amendment." *See Kimel,* 139 F.3d at 1432. The use of these magic words, however, is not required. In *Dellmuth,* Justice Scalia's tie-breaking concurrence emphasized that Congress need not explicitly refer to state sovereign immunity nor the Eleventh Amendment so long as it "clearly subjects States to suit for monetary damages." *Dellmuth,* 491 U.S. at 233, 109 S.Ct. 2397 (Scalia, J., concurring). The Equal Pay Act's enforcement provision expressly provides that the relief prescribed (including legal remedies) may be sought against a public agency "in any Federal or State court of competent jurisdiction." 29 U.S.C. § 216(b) (emphasis added). The use of the disjunctive "or" simply provides notice to Plaintiffs that they have the option of bringing suit in either federal or state court. Furthermore, congressional intent is not clouded by the reference to courts of "competent jurisdiction." This phrase generally refers to a court's subject matter jurisdiction. *See United States v. Morton,* 467 U.S. 822, 827, 104 S.Ct. 2769, 2772, 81 L.Ed.2d 680 (1984). The fact that Congress is willing to allow suits to be brought against a State in federal court does not therefore mean that *any* federal court has original jurisdiction to hear such a case.

■ When Congress chooses to encroach upon the States' sovereign immunity, the courts demand clarity, not clairvoyance.[6] The plain language of the statute makes it clear that a State may be sued for damages in federal court. Accordingly, this Court, like every other court that has previously addressed this issue, finds that Congress did express its clear intent to abrogate States' Eleventh Amendment immunity for suits brought under the Equal Pay Act. *See Ussery v. State of Louisiana,* 150 F.3d 431, 435 (5th Cir.1998); *Timmer v. Michigan Dept. of Commerce,* 104 F.3d 833 (6th Cir.1997); *Varner v. Illinois State University,* 150 F.3d 706, 710 (7th Cir.1998); *Humenansky,* 152 F.3d at 825.

## B. Congress's Power to Abrogate the States' Immunity

To abrogate the States' Eleventh Amendment immunity, Congress must act pursuant to § 5 of the Fourteenth Amendment. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. at 1123. Two issues regarding Congress's power to abrogate under § 5 are presented in this case. First, whether Congress must denote the source of its power when abrogating States' sovereign im-

---

6. Judge Edmondson places great emphasis on the Supreme Court's requirement that Congress use "unmistakably clear" language when abrogating the States' Eleventh Amendment immunity. *See Kimel,* 139 F.3d at 1430–33. This requirement, however, cannot be read too literally. There is, of course, no such thing as a statement that is "unmistakable." Language can always be misinterpreted, no matter how clear that statement might seem to a person of ordinary sensibility. The question a court must ask, then, is whether a reasonable person could mistake the meaning of the relevant statute.

munity. Second, whether the Equal Pay Act falls within Congress's power under § 5 of the Fourteenth Amendment.

### 1. Whether Congress Must State Its Intent to Act Under § 5 of the Fourteenth Amendment

Defendant contends that Congress must specify the source of its power when it abrogates States' Eleventh Amendment immunity under § 5 of the Fourteenth Amendment. Once again, Defendant relies on the Eleventh Circuit's decision in *Kimel v. State of Fla. Bd. of Regents*, 139 F.3d 1426 (11th Cir.1998), to support this contention. Specifically, Defendant claims that the court in *Kimel* held that a Plaintiff was barred from bringing suit against a State under the ADEA "because the ADEA was enacted pursuant to the Commerce Clause rather than the Fourteenth Amendment." (Def.'s Br. in Supp. of Mot. to Dismiss at 3). Consequently, Defendant argues, Plaintiff cannot bring suit under the Equal Pay Act because it too was enacted pursuant to the Commerce Clause rather than § 5 of the Fourteenth Amendment.[7]

As noted earlier, the decision in *Kimel*, at least with regard to the ADEA claim, was a fragmented one that produced no controlling opinion. A majority of the panel concluded that Congress did not abrogate the States' immunity from suit under the Eleventh Amendment for claims arising under the ADEA. Contrary to Defendant's assertions, however, the full court did not address the issue of whether Congress must specify the source of its power when abrogating the States' sovereign immunity under § 5 of the Fourteenth Amendment. Judge Edmondson, who announced the opinion of the Court, did make reference to the fact that Congress failed to expressly invoke its § 5 powers with respect to the ADEA. *See Kimel*, 139 F.3d at 1433 n. 16. He did not, however, state that such an invocation was required, and instead rested his decision on his belief that Congress failed to unequivocally express its intent to abrogate the States'

sovereign immunity for ADEA claims. *See id.* at 1430–31. In contrast, Judge Cox, who wrote a concurring opinion, rested his decision on the fact that Congress did not have the authority to enact the ADEA pursuant to § 5 of the Fourteenth Amendment. *See id.* at 1448. In dissent, Chief Judge Hatchett expressly disavowed the notion that Congress must list the source of its power when abrogating States' immunity. "The question ... is not whether Congress explicitly relied on the Fourteenth Amendment when it enacted the ADEA, but whether the statute is within Congress's authority under that amendment." *See id.* at 1441 (citing *Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 698 (1st Cir.1983)). Thus, the only judge that really addressed the issue, Judge Hatchett, reached a conclusion far different than the one Defendant asserts in this case.

As a general matter, "[t]he question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948). In *Woods*, the Supreme Court was confronted with a constitutional challenge to an act of Congress that provided for rent control during the housing shortage created by the return of World War II veterans. Although Congress did not expressly state the source of its power, it was "plain from the legislative history that Congress was invoking its war power to cope with a current condition of which the war was a direct and immediate cause." *Id.* Because the rent control measures adopted fell within the scope of Congress's war powers, the statute was upheld. *Id.* at 142, 68 S.Ct. at 423.

In the instant case, Congress is not relying on its war powers but is instead purportedly relying on its power under § 5 of the Fourteenth Amendment. Defendants in other Eleventh Amendment challenges to the Equal Pay Act have cited the Supreme Court's decision in *Pennhurst State School*

---

**7.** Contrary to Defendant's suggestion, it is not at all clear what power Congress thought it was acting under when it amended the Equal Pay Act in 1974. *See Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 838 (6th Cir.1997); *Varner*,

150 F.3d 706, 713–14 (7th Cir.1998). Congress never expressly stated what power it was relying on when it extended the application of the Equal Pay Act to the States in 1974. *See id.*

*and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), to support their argument that Congress must denote the source of its power when acting under § 5. In *Pennhurst,* the issue before the Court was whether Congress intended to create substantive rights in favor of the disabled by imposing obligations on the States under 42 U.S.C. § 6010. *See id.* at 14, 101 S.Ct. at 1538. To impose these obligations on the States, Congress would have had to rely on its powers under § 5 of the Fourteenth Amendment. Congress did not expressly invoke its § 5 powers, and the Court was unwilling to assume that Congress was acting under this provision:

> Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment.

*Id.* at 16, 101 S.Ct. at 1539; *see also Gregory v. Ashcroft,* 501 U.S. 452, 469, 111 S.Ct. 2395, 2405–06, 115 L.Ed.2d 410 (1991). The issue in *Pennhurst* was not whether Congress had the authority to act under § 5 without specifying the source of its power. Instead, the Court wanted to make sure that Congress *intended* to invade a traditional area of State sovereignty. *See Doe v. University of Illinois,* 138 F.3d 653, 658 (7th Cir.1998) *Ussery,* 150 F.3d at 436–37. In the instant case, by contrast, Congress's intent to subject States to suits under the EPA is quite clear. *See Varner,* 150 F.3d at 712. Accordingly, Congress had no obligation to expressly invoke its § 5 powers in this instance. The Supreme Court has confirmed this interpretation of *Pennhurst,* expressly disavowing the notion that "congressional action [can] not be upheld on the basis of § 5 unless Congress 'expressly articulate[s] its intent to legislate under § 5....'" *EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064, 75 L.Ed.2d 18 (1983) (dicta).

Essentially, the rule in *Pennhurst* is much like the clear-statement rule found in the Court's Eleventh Amendment jurisprudence. In both instances, the courts force Congress, as the guardian of federalism, to give sufficient attention to the interests of the States before altering "the fundamental constitutional balance" of our federal system. *See Dellmuth v. Muth,* 491 U.S. at 227, 109 S.Ct. at 2400. Once Congress decides to alter that balance, however, its basis for doing so is relevant only in addressing the question of whether Congress was acting within the scope of its constitutional authority. "Congress need not catalog the grants of power under which it legislates; courts do not remand statutes for better statements of reasons." *Doe v. University of Illinois,* 138 F.3d 653, 678 (Easterbrook, J., respecting denial of rehearing en banc). Accordingly, this Court, like every other circuit court that has addressed this issue, agrees that Congress need not expressly invoke its § 5 powers when abrogating States' Eleventh Amendment immunity. *See e.g. Ussery v. State of Louisiana,* 150 F.3d 431 (5th Cir. 1998); *Timmer v. Michigan Dept. of Commerce,* 104 F.3d 833 (6th Cir.1997); *EEOC v. Elrod,* 674 F.2d 601 (7th Cir.1982); *Varner v. Illinois State University,* 150 F.3d 706 (7th Cir.1998). The only remaining question is whether Congress had the power to enact the Equal Pay Act under § 5 of the Fourteenth Amendment.

**b.** *Whether the Equal Pay Act is Within Congress's § 5 Enforcement Powers*

 The remaining inquiry is "whether the objectives of the [Equal Pay Act] are within Congress's power under the [Fourteenth Amendment]."[8] *Varner,* 150 F.3d at 712. Section 5 of the Fourteenth Amendment provides that "Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. A claim of discrimination under the Fourteenth Amendment requires evidence of purposeful discrimination. *See Personnel Adm'r v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870

---

**8.** In contrast to the Equal Pay Act, the courts agree that the FLSA's minimum wage and overtime provisions are not within Congress's power under § 5 of the Fourteenth Amendment. *See*

*Powell v. State of Florida,* 132 F.3d 677, 678 (11th Cir.1998); *Mills v. State of Maine,* 118 F.3d 37, 48 (1st Cir.1997).

(1979). The Equal Pay Act, by contrast, does not require proof of a discriminatory purpose. A plaintiff may establish a prima facie case under the Act by proving that a disparity in pay exists between men and women who perform substantially similar jobs. *See Meeks v. Computer Associates Int'l.*, 15 F.3d 1013, 1019 (11th Cir.1994). Consequently, one court specifically held that the Equal Pay Act is beyond the scope of Congress's power under § 5 of the Fourteenth Amendment. *See Larry v. Bd. of Trustees of University of Ala.*, 975 F.Supp. 1447 (N.D.Ala.1997).

The Former Fifth Circuit addressed a similar issue in *Scott v.. City of Anniston,* 597 F.2d 897 (5th Cir.1979). The court in *Scott* examined the extent of Congress's power under § 5 of the Fourteenth Amendment in a case involving a claim that Congress lacked the power to apply Title VII's disparate impact theory to the States. In that case, the trial court ruled that "the legislature could not by statute create a right of action subject to less stringent requirements than those imposed by the [Fourteenth Amendment] alone." *Id.* at 899. The former Fifth Circuit did not agree, saying that the Fourteenth Amendment "empowers Congress to enact appropriate legislation establishing more exacting requirements than those minimum safeguards provided in the amendment." *Id.* (citing *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)). Thus, the court in *Scott* followed the "one-way ratchet" theory seemingly advocated by the Supreme Court in *Morgan,* whereby Congress may expand, but not dilute, the protections afforded by the Fourteenth Amendment. *See Reynolds v. Alabama Dept. of Transp.,* 4 F.Supp.2d 1092, 1103 (M.D.Ala. 1998). A recent decision by the Supreme Court, however, rejected this theory. *See City of Boerne v. Flores,* 521 U.S. 507, ——, 117 S.Ct. 2157, 2168, 138 L.Ed.2d 624 (1997). Consequently, the *Scott* decision is not binding precedent in this case. *See United States v. Shenberg,* 89 F.3d 1461, 1480 n. 23 (11th Cir.1996) (recognizing that prior panel decisions may be implicitly overruled by intervening law from the Supreme Court).

In *City of Boerne,* the Supreme Court invalidated the Religious Freedom and Restoration Act ("RFRA") on the ground that the statute represented an unconstitutional attempt by Congress to substantively expand the Fourteenth Amendment. In so doing, the Court eschewed an expansive reading of *Morgan* that would permit Congress to substantively define the scope of the protection provided by the Fourteenth Amendment. *See id.* at ——, 117 S.Ct. at 2168. "The design of the [Fourteenth] Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States." *Id.* at ——, 117 S.Ct. at 2164. Instead, § 5 permits Congress to remedy or deter constitutional violations. *See id.* at 2163. The Court noted the difficulty in distinguishing remedial or preventive measures from measures that make substantive changes. *Id.* at ——, 117 S.Ct. at 2163. Notwithstanding this difficulty, the Court said, "the distinction exists and it must be observed."

In drawing the distinction between remedial or preventive measures and measures that constitute substantive extensions of the Fourteenth Amendment, a court must now ask whether there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne,* 521 U.S. at ——, 117 S.Ct. at 2164. RFRA was purportedly enacted to prevent and remedy laws "enacted with the unconstitutional object of targeting religious beliefs and practices." *Id.* Under the statute, any law that substantially burdened the free exercise of religion had to be justified as "the least restrictive means of furthering a compelling state interest." *Varner v. Illinois State University,* 150 F.3d at 715; *see also* 42 U.S.C. § 2000bb–1. Yet, as the Supreme Court observed, "RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry." *City of Boerne,* 521 U.S. at ——, 117 S.Ct. at 2169. The Court was therefore forced to conclude that RFRA was outside the scope of Congress's power under § 5 of the Fourteenth Amendment. "RFRA is so out of proportion to a supposed remedial or preventive object

that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections." *Id.* at ——, 117 S.Ct. at 2170.

Because the Equal Pay Act does not require proof of discriminatory intent, the Act undoubtedly prohibits conduct that is facially constitutional. *See Varner,* 150 F.3d at 716. Consequently, as noted *supra,* some courts have found the Equal Pay Act to be an attempt by Congress to substantively change the constitutional protections found in the Fourteenth Amendment. *See Larry,* 975 F.Supp. at 1450. The Supreme Court, however, explicitly noted that remedial legislation may be permitted in some instances "even if in the process it prohibits conduct that is not itself unconstitutional." *City of Boerne,* 521 U.S. at ——, 117 S.Ct. at 2163. To determine whether the Equal Pay Act constitutes an impermissible attempt to substantively extend the protections of the Fourteenth Amendment, the "congruence and proportionality" test from *City of Boerne* must be applied. *See id.* at ——, 117 S.Ct. at 2164.

 In contrast to RFRA, Congress had a factual basis for taking remedial action under the Equal Pay Act. The Senate Report to the Act recognized the persistent discrimination against women resulting from "an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." S.Rep. No. 176, 88th Cong., 1st Sess., 1 (1963). Although the Equal Pay Act was not extended to the States until 1974, the endemic discrimination that led Congress to originally pass the Act certainly provided it with a factual predicate for extending the Act to the States.

More importantly, the means Congress adopted by enacting the Equal Pay Act are not out of proportion to the harm it sought to prevent, namely, intentional discrimination against women. To establish a prima facie case, a Plaintiff must show that the employer pays members of the opposite sex more money "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under substantially similar working conditions." 29 U.S.C. § 206(d)(1). An employer is given three specific affirmative defenses that apply if the wage differentials result from: (i) a seniority system, (ii) a merit system, or (iii) a system that measures wages by quantity or quality of production. *See id.* Furthermore, an employer may escape liability altogether under the "catch-all" defense if it can show that the discrepancy is "based on any other factor than sex." *See id.* § 206(d)(1)(iv), *see also Varner,* 150 F.3d at 717.

The Equal Pay Act's statutory scheme stands in stark contrast to the one struck down by the Supreme Court in *City of Boerne.* There, the "[s]weeping coverage" of the statute made it clear that it would encroach upon "every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." *City of Boerne,* 521 U.S. at ——, 117 S.Ct. at 2170. The Equal Pay Act, by contrast, is much more limited in scope. So long as an employer can prove that a wage disparity among members of different genders is not based on sex, it can avoid liability altogether. The Equal Pay Act, then, does not attempt to expand the substantive protections afforded by the Fourteenth Amendment. Instead, the Act is a proportional response by Congress to unconstitutional discrimination against women. *See Varner,* 150 F.3d at 717. As such, the Equal Pay Act is a permissible exercise of Congress's power under § 5 of the Fourteenth Amendment. *See id.; Ussery,* 150 F.3d at 437.

The two requirements for Congressional abrogation of the States' Eleventh Amendment immunity have been met in this case. First, Congress clearly expressed its intent to abrogate such immunity for claims arising under the Equal Pay Act. Second, Congress acted pursuant to a valid exercise of power. Accordingly, Defendant's Motion to Dismiss based on Eleventh Amendment immunity is **DENIED.**